UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANNY ZELAYA,<br><br>          Petitioner,<br><br>   v.<br><br>KEN CLARK, Warden,[1]<br><br>          Respondent. | Case No. 17-cv-03499-YGR (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; AND DENYING CERTIFICATE OF APPEALABILITY** |

Petitioner Danny Zelaya, a state prisoner currently incarcerated at California State Prison - Corcoran, brings the instant *pro se* habeas action under 28 U.S.C. § 2254 to challenge his 2014 conviction and sentence rendered in the Contra Costa County Superior Court involving sexual offenses against his former girlfriend E.'s niece, Jane Doe,[2] over a period of three years from 2010 to 2013. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES all claims in the petition for the reasons set forth below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The California Court of Appeal summarized the facts of Petitioner's offense as follows. This summary is presumed correct. *See Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

> The Contra Costa County District Attorney filed an information charging [Petitioner] in counts one and three with sexual acts with a child 10 years old or younger (§ 288.7, subd. (b)), and in counts two, four, five, and six with lewd acts upon a child under age 14 (§ 288, subd. (a)).[FN2] At trial, the information was amended to allege for counts two, four, five, and six, [Petitioner] engaged in substantial sexual conduct pursuant to section 1203.066, subdivision (a)(8).
>
> [FN 2:] [Petitioner] was also charged with two counts of forcible lewd acts upon a child under age 14 (§ 288, subd. (b)(1)) for conduct related

---

[1] Ken Clark, the current warden of the prison where Petitioner is incarcerated, has been substituted as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] To protect the identity of the victim, the victim's younger sister, and their aunt, the state appellate court referred to them respectively as "Jane Doe," "Jane Doe 2," and "E." This Court will do the same in the instant Order. The Court further notes that Petitioner was acquitted of all counts relating to the victim's sister, Jane Doe 2. *See* 1 CT 179-189.

United States District Court<br>Northern District of California

to Jane Doe 2 (Jane Doe's sister), but he was not convicted of these counts at trial. [Petitioner] was also acquitted of one count (count three, § 288, subd. (b)) related to Jane Doe.

*Evidence at Trial*

[Petitioner] was the boyfriend of Jane Doe's aunt, E. [Petitioner] and E. lived in three locations: the first was an apartment on North Broadway Avenue in Bay Point, then a house on Vista Way in Antioch, followed by another house on Texas Street in Antioch. E. testified that they lived in the Bay Point apartment from approximately March 2010 until August 2010. She and [Petitioner] moved to the Texas Street house in approximately May 2013. E. would regularly babysit Jane Doe and her sister.

Jane Doe's mother (mother) noticed a change in Jane Doe's behavior in 2013. Jane Doe had become angry, she wanted to spend time alone, and her grades dropped at school. In fall 2013, mother found Jane Doe crying in her room and Jane Doe told her [Petitioner] had been touching her. Jane Doe said it started in Bay Point (in 2010). Mother reported the abuse to the police.

Antioch Police Department Sergeant Santiago Castillo conducted a recorded interview of Jane Doe. In the interview, which was played for the jury, she described the abuse. She said the first touching occurred when she was eight years old. She said [Petitioner] pulled her into the bedroom and said "Let me touch you." He touched her breasts under her shirt and touched her on "top and bottom" on her bare skin. He told her "[t]his is our secret" and she should not tell anyone or he would go to jail. She said it happened at the Bay Point apartment more than 20 times when she was eight and nine years old. She said it stopped between ages nine and ten when E. and [Petitioner] moved to a different house, and then started again in their current house. In his current house, he touched her under her clothing on her vagina. [Petitioner] encouraged her to touch his penis but she refused. Jane Doe stated that it happened "pretty much every time" she saw [Petitioner].

Jane Doe was also interviewed at the Children's Interview Center (CIC) and the recording was played for the jury. Jane Doe stated that [Petitioner] began touching her when she was eight years old. She described the first incident when she was eight years old in the bedroom as [Petitioner] unzipping her shorts. She said the shorts were "really tight" so he had to unzip the zipper. Then he was "squishing" her under her clothes and touching her "deep hole pocket" or her "heiny." She said the first time he "squished" her breasts touching her skin and "squish[ed]" her vaginal area over her panties. She said when she was 10 years old, [Petitioner] sucked her breasts. When she was 10 and 11, he began rubbing her under her panties.

When the interviewer asked Jane Doe if [Petitioner] ever put his hands inside her body when he was rubbing her underneath her panties, she said that on one occasion, he put his finger in her "guts." She said it happened when her aunt asked [Petitioner] to go to the Mi Pueblo grocery store and he took her with him. She said that [Petitioner] told her that if she let him touch her, he would buy her chips. She said: "He would go in the guts and get the juicy thing and

squishy and slimy thing and eat it." She then said that "sometimes when I pee I forget to wipe" and it leaves something "slimy." The interviewer said that it was okay to forget to wipe and Jane Doe responded, "Well, I'm eleven years old, I'm not supposed to forget." The interviewer asked her what she was wearing, and she responded "the same shorts, the tight shorts." She said [Petitioner] undid the zipper.

At the time of trial Jane Doe was 11 years old (she was born in 2002). Jane Doe testified that [Petitioner] and E. had lived in three places: an apartment and two houses. She testified [Petitioner] touched her at the apartment and the last house. During trial, Jane Doe was emotional so she was unable to explain the details of the touching. She testified that [Petitioner] touched her in a car when they went to a "Mexican store." She did not remember how old she was when it happened, but it was when [Petitioner] lived at the Bay Point apartment. Her Aunt E., however, testified that she never sent [Petitioner] to the store with Jane Doe. E. explained that the children never rode in the car with her or [Petitioner] because they did not have car seats.

The jury heard two recorded interviews between [Petitioner] and Sergeant Castillo. When [Petitioner] was initially interviewed at his home, he immediately admitted his conduct. He admitted the abuse began at the Bay Point apartment and continued for three years. He initially agreed that he had touched Jane Doe more than 50 times, but later in the interview, he said it only happened a few times. He admitted to touching her under her shirt and on the outside of her panties, but claimed he never touched her vagina. He later said that he may have touched inside her panties one time. He explained that he touched her because he would "start feeling something weird in my body." He said there something bad inside of him and he cannot control it. He repeatedly said that Jane Doe was not lying. [Petitioner] stated that he would "have to pay with jail for what [he] did."

Dr. Jim Carpenter, a pediatrician specializing in child abuse pediatrics, testified about the structure of female genitalia and the sexual maturation of girls. During his testimony, he explained some girls enter puberty as early as eight or nine years old and some as late as 17 or 18 years old. He said the average age is between 9 and 12 years old. He said that prepubertal girls may have vaginal discharge; it is often the first sign of puberty. He testified 11 years old is a "common age" for discharge to be present.

*[Petitioner]'s Section 1118.1 Motion*
During trial, [Petitioner] made a motion for judgment of acquittal pursuant to section 1118.1 for counts one and three because there was no evidence that Jane Doe was 10 years old or younger when the sexual penetration occurred. The prosecutor argued that Jane Doe testified that the touching in the car occurred when [Petitioner] lived at the Bay Point apartment in 2010 when Jane Doe was under the age of 10. The court denied the motion, stating there was sufficient evidence for the counts to go to the jury.

3

*Jury Verdict*

The jury found [Petitioner] guilty of count one: sexual acts with a child 10 years or [sic] old or younger (§ 288.7, subd. (b)), and counts two, four, five and six: lewd acts upon a child under age 14 (§ 288, subd. (a)). The jury acquitted [Petitioner] of count three (§ 288.7, subd. (b)) and counts seven and eight (§ 288, subd. (b)(1)) related to Jane Doe 2. The jury found not true that in counts two, four, five, and six, [Petitioner] engaged in substantial sexual conduct pursuant to section 1203.066, subdivision (a)(7) against more than one victim. The jury further found not true that [Petitioner] was guilty of two or more sex offenses against more than one victim pursuant to section 667.61, subdivision (e)(4).

*Sentencing*

At the sentencing hearing, the prosecutor read a letter from Jane Doe's mother addressing the impact the abuse had on her daughters and her family. She described Jane Doe as having great difficulty overcoming the incident. Jane Doe "loses all interest in her normal routine and lives in an imaginary world." Mother stated she felt guilty for what happened to her daughters and felt as though she cannot move forward with her life.

The prosecutor argued that although [Petitioner] has no criminal history and acknowledged the crimes, his conduct in victimizing Jane Doe occurred over a period of three years. The prosecutor requested a sentence of 29 years to life. [Petitioner]'s counsel argued for sentence of 15 years to life. He contended that although all crimes involving abuse of a child are egregious, this case did not involve sexual intercourse, threats, or use of force.

The court found: "[I]t is hard to argue about the severity of the conduct by the defendant when one sees the [e]ffect of the conduct on Jane Doe. It is such a tragedy." The court found that [Petitioner] took advantage of a position of trust as a family member and the crimes were committed at different times in different places over a period of years. The court noted, in mitigation, [Petitioner] had no criminal record and there was an early acknowledgment of wrongdoing. The court stated "while it was a little chilling [to hear] Mr. [Petitioner]'s description of how he feels when he saw a woman—young, young, woman, a girl of Jane [Doe's] age, how that made him feel physically, it also was a certain frankness and directness that we don't hear from sex offenders either until they've undergone quite a bit of treatment."

The court then imposed a total sentence of 21 years to life. The sentence consisted of an indeterminate term of 15 years to life on count one and determinate terms of six years for counts two, four, five, and six. For counts two, four, five, and six, the court selected the mid-term of six years for each count, but ordered the six-year terms to be served concurrently. The court further ordered the determinate six-year term as to count two to run consecutively to the indeterminate term of 15 years to life on count one.

*People v. Zelaya*, No. A143200, 2016 WL 491659, *1-3 (Cal. Ct. App. Feb. 8, 2016) (brackets added).

4

## II.     STATE AND FEDERAL COURT PROCEEDINGS

On August 1, 2014, Petitioner appealed the judgment to the California Court of Appeal.  1 CT 249.  On appeal, Petitioner raised two claims: (1) insufficiency of the evidence as it pertained to one count of sexual acts with a child 10 years old or younger (count one); and (2) his sentence constitutes cruel and unusual punishment under both the United States and California Constitutions.  *Zelaya*, 2016 WL 491659, at *1.

On February 8, 2016, the California Court of Appeal rejected the aforementioned claims and affirmed the conviction.  *Id.*

On March 11, 2016, Petitioner filed a petition for review in the California Supreme Court. *See People v. Danny Zelaya*, Case No. S232957 (Mar. 11, 2016).

On September 30, 2016, Petitioner filed a state habeas petition in the California Supreme Court, in which, in addition to the above two claims, he alleged that the trial court erred in admitting into evidence the audiotape-recording of the initial police interview which occurred at Petitioner's home on October 1, 2013[3] because it constituted a custodial interrogation, in violation of *Miranda*.[4]  *See In re Zelaya (Danny) on H.C.*, Case No. S237535 (Nov. 30, 2016); Resp't Ex. 16 (Dkt. 15-7 at 151).

On April 13, 2016, the California Supreme Court denied the petition for review.  *See People v. Danny Zelaya*, Case No. S232957 (Apr. 13, 2016).

On November 30, 2016, the state supreme court summarily denied Petitioner's state habeas petition.  *See In re Zelaya (Danny) on Habeas Corpus*, Case No. S237535 (Nov. 30, 2016); Resp't Ex. 16.

On June 16, 2017, Petitioner filed the instant federal habeas action in this Court.  *See* Dkt.

---

[3] The record shows that on October 1, 2013, Petitioner was interviewed a second time after he was "arrested and transported to the police department where he was then advised of his *Miranda* rights."  Dkt. 15-7 at 153.  Petitioner only challenges the admission of his statements made "when police officers interrogated [him] *prior to* the advisement of *Miranda* rights."  *Id.* (emphasis added).  Therefore, the Court notes that Petitioner's *Miranda* claim only relates to the *initial* interview at his home.  *Id.* at 151-53.

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

1. Petitioner raises the same two claims from his direct appeal, as well as the *Miranda* claim from his state habeas petition. *See id* at 15-30.[5]

On August 3, 2017, this Court issued an Order to Show Cause. Dkt. 3. Respondent filed an Answer and Memorandum of Points and Authority in Support of Answer. Dkts. 15, 15-1. On August 13, 2018, Petitioner filed a Traverse. Dkt. 22. The matter is fully briefed and ripe for adjudication.

## III. LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, s*ee Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of section 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that

---

[5] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

United States District Court
Northern District of California

principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In determining whether a state court's decision is contrary to, or involves an unreasonable application of, clearly established federal law, courts in this Circuit look to the decision of the highest state court to address the merits of the petitioner's claim in a reasoned decision. *See Wilson v. Sellers*, __ U.S. __, 138 S. Ct. 1188, 1192 (2018); *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Even if constitutional error is established, habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). In applying the above standards on habeas review, the Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

When there is no reasoned opinion from the highest state court to consider the petitioner's

7

claims, the court looks to the last reasoned opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). Thus, a federal court will "look through" the unexplained orders of the state courts rejecting a petitioner's claims and analyze whether the last reasoned opinion of the state court unreasonably applied Supreme Court precedent. *See Ylst*, 501 U.S. at 804-06; *LaJoie*, 217 F.3d at 669 n.7. The last reasoned decision in this case is the state appellate court's unpublished disposition issued on February 8, 2016, which relates to Petitioner's first two federal claims in the petition. *Zelaya*, 2016 WL 491659, at *1-7.

Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law. *Plascencia v. Alameida*, 467 F.3d 1190, 1197-98 (9th Cir. 2006); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). Here, Petitioner presented the remaining federal claim—his *Miranda* claim—in his state habeas petition, which the state supreme court summarily denied. *See In re Zelaya (Danny) on Habeas Corpus*, Case No. S237535 (Nov. 30, 2016). As such, this *Miranda* claim may be reviewed independently by the Court to determine whether that decision was an objectively unreasonable application of clearly established federal law. *See Plascencia*, 467 F.3d at 1197-98; *Himes*, 336 F.3d at 853.

## IV.     DISCUSSION

### A. Sufficiency of the Evidence

#### 1.     Background

Petitioner argues that the evidence was insufficient to support the jury's verdict of guilty on one count of sexual acts with a child 10 years old or younger under California Penal Code section 288.7(b) (count one). Dkt. 1 at 15. Specifically, he argues that insufficient evidence existed to show that Jane Doe was 10 years old or younger when he sexually penetrated her. *Id.* at 18. Petitioner points out that count one was "based on an incident wherein [he] was alleged to have driven to a Mi Pueblo grocery store with [Jane Doe] in tow, during which he inserted his finger into her vagina, then put his finger in his mouth." *Id.* Petitioner contends there was

conflicting testimony as to *when* this incident occurred, and it may have been when Jane Doe was 11 years old. *Id.* at 18-20.

In rejecting this claim, the state appellate court stated as follows:

> In reviewing [Petitioner]'s claim of insufficiency of the evidence, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]" (*People v. Lindberg* (2008) 45 Cal. 4th 1, 27.) "We view the evidence in the light most favorable to the prosecution, and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence . . . ." (*People v. Griffin* (2004) 33 Cal. 4th 1015, 1028, citing *People v. Ochoa* (1993) 6 Cal. 4th 1199, 1206 (*Ochoa*).)

> Section 288.7 subdivision (b) provides: "Any person 18 years of age or older who engages in oral copulation or sexual penetration, as defined in Section 289, with a child who is 10 years of age or younger is guilty of a felony and shall be punished by imprisonment in the state prison for a term of 15 years to life." (§ 288.7, subd. (b).) The statute defines sexual penetration as "the act of causing the penetration, however slight, of the genital or anal opening of any person" for the purpose of sexual arousal or gratification. (§ 289, subd. (k)(1).) Thus, "sexual penetration" does not have to be vaginal penetration but only penetration of the labia, not the vagina. (See *People v. Quintana* (2001) 89 Cal. App. 4th 1362, 1371.)

> For purposes of section 288.7, a child is "10 years of age or younger" if the minor has not yet reached his or her 11th birthday as of the time of the sexual assault. (*People v. Cornett* (2012) 53 Cal. 4th 1261, 1265-1266.)

> The prosecution presented substantial evidence that the sexual penetration occurred when Jane Doe was younger than 11 years old. Jane Doe testified at trial [Petitioner] touched her in a car when they went to a "Mexican store." She did not remember how old she was when it happened, but she said it was when [Petitioner] lived at the Bay Point apartment. The testimony at trial established [Petitioner] lived at the Bay Point apartment when Jane Doe was eight years old.

> During the CIC interview, Jane Doe described the incident when [Petitioner] touched her under her panties and put his finger in her "guts." She again said it happened in the car when they went to the Mexican grocery store. She said: "He would go in the guts and get the juicy thing and squishy and slimy thing and eat it." The CIC interviewer did not ask her how old she was when this occurred, but Jane Doe described that she was wearing "the same shorts, the tight shorts." She had earlier described the "tight shorts" when discussing the very first time [Petitioner] touched her at the Bay Point apartment. She said when she was eight years old, she had on tight shorts and he had to unzip the zipper to be able to touch her panties.

9

From Jane Doe's testimony, viewing the evidence in the light most favorable to the prosecution, the jury could reasonably conclude that the sexual penetration occurred when Jane Doe was eight years old. At trial, she testified the incident occurred when [Petitioner] lived at the Bay Point apartment in 2010 when Jane Doe was eight years old. Also, both at the CIC interview and at trial, Jane Doe described the penetration as happening on the car ride to the Mexican grocery store. In the CIC interview, she described wearing the same tight shorts as when [Petitioner] first touched her at age eight.

[Petitioner]'s argument to the contrary is that Jane Doe's description of vaginal discharge was consistent with a girl at the onset of puberty, not an eight year old. [Petitioner] relies on the testimony of Dr. Carpenter that girls begin to have a white discharge when they enter puberty. However, Dr. Carpenter explained that girls may enter puberty as early as eight years old, or as late as 17 or 18 years old. He said the average age is between 9 and 12 years old. He also testified that "prepubertal" girls may have vaginal discharge. While he stated that 11 years old is a "common age" for discharge to be present, it could be present earlier. As respondent makes clear, Dr. Carpenter did not testify about when Jane Doe began puberty.

There was also evidence that the substance Jane Doe referred to during the incident was urine and not vaginal discharge. Jane Doe stated "sometimes when I pee I forget to wipe" and it leaves something "slimy." The interviewer said that it was okay to forget to wipe and Jane Doe responded "Well, I'm eleven years old, I'm not supposed to forget." [Petitioner] interprets this to mean that the incident must have happened when she was 11 years old. However, it could also be reasonably interpreted that she has sometimes forgotten to wipe for months or years and she should no longer forget because she was now 11 years old at the time she testified.

The jury heard all the evidence and as a rational trier of fact could find [Petitioner] guilty of sexual penetration of a child under 10 years old. (See *Ochoa*, supra, 6 Cal. 4th at p. 1206 ["'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.'"].) Resolving all conflicts in favor of the prosecution, we conclude there was sufficient evidence to support [Petitioner]'s conviction on count one.

*Zelaya*, 2016 WL 491659, at *4-5 (brackets added).

## 2.  Applicable Law

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim,

10

*see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id.* at 324.

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings." *Coleman v. Johnson*, 566 U.S. 650, 132 S. Ct. 2060, 2062 (2012) (per curiam). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. *Jackson*, 443 U.S. at 324.

On habeas review, a federal court evaluating the evidence under *Jackson* and *Winship* should take into consideration all of the evidence presented at trial. *LaMere v. Slaughter*, 458 F.3d 878, 882 (9th Cir. 2006) (in a case where both sides have presented evidence, a habeas court need not confine its analysis to evidence presented by the state in its case-in-chief). If confronted by a record that supports conflicting inferences, a federal habeas court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. A jury's credibility determinations are therefore entitled to near-total deference. *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional of circumstances, *Jackson* does not permit a federal habeas court to revisit credibility determinations. *See id.* (credibility contest between victim alleging sexual molestation and defendant vehemently denying allegations of wrongdoing not a basis for revisiting jury's obvious credibility determination); *see also People v. McGravey*, 14 F.3d 1344, 1346-47 (9th Cir. 1994) (upholding conviction for sexual molestation based entirely on uncorroborated testimony of victim).

Under 28 U.S.C. § 2254(d), a federal habeas court applies *Jackson* and *Winship* with an additional layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). A federal habeas court must ask whether the operative state court decision "reflected an 'unreasonable

11

application' of *Jackson* and *Winship* to the facts of this case." *Id.* at 1275 (citing 28 U.S.C. § 2254(d)(1)).

### 3. Analysis

As mentioned above, Petitioner argued his insufficiency of the evidence claim on direct appeal, and the state appellate court rejected it upon finding that the "prosecution presented substantial evidence that the sexual penetration occurred when Jane Doe was *younger* than 11 years old." *Zelaya*, 2016 WL 491659, at *3-4 (emphasis added).

Section 288.7 subdivision (b) provides: "Any person 18 years of age or older who engages in oral copulation or sexual penetration, as defined in Section 289, with a child who is 10 years of age or younger is guilty of a felony and shall be punished by imprisonment in the state prison for a term of 15 years to life." 28 U.S.C. § 288.7(b). For purposes of section 288.7, a child is "10 years of age or younger" if the minor has not yet reached his or her eleventh birthday as of the time of the sexual assault. *People v. Cornett*, 53 Cal. 4th 1265-66.

Here, after reviewing the totality of the evidence, the state appellate court stated that in reaching its decision, "[t]he proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt," and that on appeal the court must "view the evidence in the light most favorable to the prosecution, and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." *Zelaya*, 2016 WL 491659, at *4-5 (quoting *People v. Ochoa*, 6 Cal. 4th 1199, 1206 (1993)). In doing so, the state appellate court reasonably determined that the "jury heard all the evidence and as a rational trier of fact could find [Petitioner] guilty of sexual penetration of a child under 10 years old." *Zelaya*, 2016 WL 491659, at *5. The prosecution presented evidence of Jane Doe's age as being 10 years old or younger (at the time of the sexual penetration) by playing for the jury an audiotape-recording of Jane Doe's CIC interview, in which she describes the incident at issue. Dkt. 15-4 at 27-71. Jane Doe described the incident when Petitioner touched her under her panties and put his finger in her "guts" on a car ride to a Mexican grocery store during a time when he lived at the Bay Point apartment. *Id.* at 64-67. (E. confirmed Petitioner lived at the Bay Point apartment from March

2010 to August 2010, when Jane Doe was 8 years old. 2 RT 241-242.) During the same CIC interview, Jane Doe clarified that the aforementioned sexual penetration occurred when she wore the same tight shorts she was wearing during the very "first time" Petitioner touched her in the Bay Point apartment when she was 8 years old. Dkt. 15-4 at 65. Jane Doe specified that when she was eight years old, she had on tight shorts and Petitioner had to unzip the zipper to be able to touch her panties. *Id.* at 44, 50-51. The aforementioned evidence constitutes "substantial evidence" from which a reasonable trier of fact could find the element relating to the victim's age ("10 years of age or younger") as being satisfied.

Petitioner points out that E. testified at trial that she never sent Petitioner to the store with Jane Doe, and that the children never rode in the car with her or Petitioner because they did not have car seats. 2 RT 282-283, 286. However, as mentioned above, Jane Doe's description at the CIC interview of the incident involving the sexual penetration occurring in the car contradicts E.'s testimony. Dkt. 15-4 at 64-67. In addition, E.'s testimony is also contradicted by Jane Doe's trial testimony, during which she testified that Petitioner did "something bad" to her in a car while he was driving. 2 RT 146-148. Jane Doe testified that she did not remember how old she was when it happened, but she said it was when Petitioner lived at the Bay Point apartment. 2 RT 129-130, 148, 153. The task of evaluating the testimony of witnesses and determining the truthfulness and weight of the evidence is reserved for the trier of fact. *Jackson*, 443 U.S. at 319. Therefore, the jury could have reasonably chosen to believe Jane Doe's statements regarding the sexual penetration which happened during a car ride when she was 10 years old or younger, and chosen not to believe Petitioner's denial or E.'s aforementioned testimony relating to this incident.

Viewing the aforementioned evidence in the light most favorable to the prosecution, a rational trier of fact could have found that, based on the totality of the circumstances, the sexual penetration occurred when Jane Doe was 10 years old or younger. Thus, the state appellate court's decision was reasonable in rejecting the sufficiency of the evidence challenge and concluding that any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt on one count of sexual acts with a child 10 years old or younger. Accordingly, the state appellate court's denial of this claim was not an unreasonable application of *Jackson* and *Winship*. *Juan H.*, 408

F.3d. at 1275 (citing 28 U.S.C. § 2254(d)(1)).  Therefore, this claim is DENIED.

## B.    Cruel and Unusual Punishment

### 1.    Background

Petitioner contends his sentence was a cruel and unusual punishment, violating his rights established by the Eighth Amendment of the U.S. Constitution and Article I, Section 17 of the California Constitution.  Dkt. 1 at 21.  Petitioner argues that "neither the circumstances of the offenses nor Petitioner's personal characteristics justify a sentence of 15-year[s] to life for Count 1" because "no weapon was used, there was no threats . . . [t]here was no actual sexual intercourse . . . [and] the acts themselves did not result in any harm."  Dkt. 22 at 8.  Further, Petitioner claims his personal characteristics, including that he was in his early 20s when he committed the crime, had no criminal record, immigrated to the U.S. at the age of 16 to avoid gang threats, and immediately admitted to his wrongdoing show that his punishment is not justified.  *Id.*

### 2.    Applicable Law

A criminal sentence that is not proportionate to the crime for which the defendant was convicted violates the Eighth Amendment.  *Solem v. Helm*, 463 U.S. 277, 303 (1983) (sentence of life imprisonment without possibility of parole for seventh nonviolent felony violates Eighth Amendment).  The Eighth Amendment contains a "narrow" proportionality principle.  *Graham v, Florida*, 560 U.S. 48, 59-60 (2010).  This principle "'does not require strict proportionality between crime and sentence' but rather 'forbids only extreme sentences that are grossly disproportionate to the crime.'"  *Id.*  "[O]utside the context of capital punishment, *successful* challenges to the proportionality of particular sentences will be exceedingly rare."  *Solem*, 463 U.S. at 289-90 (citation and quotation marks omitted) (emphasis in original); *see also Crosby v. Schwartz*, 678 F.3d 784, 795 (9th Cir. 2012) ("Circumstances satisfying the gross disproportionality principle are rare and extreme, and constitutional violations on that ground are 'only for the extraordinary case.'") (citing *Lockyer v. Andrade*, 538 U.S. 63, 77 (2003)).  In analyzing a disproportionality challenge to a specific sentence, the court "considers all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive."

*Graham*, 560 U.S. at 59. Only extreme sentences that are grossly disproportionate to the crime violate the Eighth Amendment. *United States v. Carr*, 56 F.3d 38, 39 (9th Cir. 1995).

For the purposes of review under 28 U.S.C. § 2254(d)(1), it is clearly established that "[a] gross disproportionality principle is applicable to sentences for terms of years." *Andrade*, 538 U.S. at 72; *Gonzalez v. Duncan*, 551 F.3d 875, 882 (9th Cir. 2008). Prior to *Graham*, but after *Andrade* and *Ewing v. California*, 538 U.S. 11 (2003), the "only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' [AEDPA] framework is the gross disproportionality principle, the precise contours of which are unclear and which is applicable only in the "'exceedingly rare' and 'extreme' case." *Norris v. Morgan*, 622 F.3d 1276, 1286 (9th Cir. 2010) (quoting *Andrade*, 538 U.S. at 72); *see Gonzalez*, 551 F.3d at 882 ("The Supreme Court's Eighth Amendment jurisprudence establishes that no penalty is *per se* constitutional, and that successful challenges to the proportionality of particular sentences are exceedingly rare and reserved only for the extraordinary case.") (internal quotation, brackets, and citation omitted). Thus, at a minimum, prior to *Graham* but after *Andrade* and *Ewing*, "it was clearly established . . . that in applying gross disproportionality principle courts must objectively measure the severity of a defendant's sentence in light of the crimes he committed." *Norris*, 622 F.3d at 1287.

### 3. Analysis

The state appellate court rejected Petitioner's claim that his sentence constituted cruel and unusual punishment, stating as follows:

> [Petitioner]'s sentence of 15 years to life on count one was mandated by statute. (§ 288.7, subd. (b).) The court imposed a total sentence of 21 years to life consisting of 15 years to life on count one, and a mid-range term of six years on counts two, four, five and six, with the six-year term as to count two to run consecutive to the 15-year term as to count one.
>
> A punishment violates the Eighth Amendment if it involves the "unnecessary and wanton infliction of pain" or if it is "grossly out of proportion to the severity of the crime." (*Gregg v. Georgia* (1976) 428 U.S. 153, 173.) "[I]n California a punishment may violate article I, section 6, of the Constitution if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal. 3d 410, 424, fn. omitted.)

Under *Lynch* we examine (1) the nature of the offender, (2) compare the punishment with the penalty for more serious crimes in the same jurisdiction, and (3) compare the punishment with the penalty for more serious crimes in other jurisdictions. (*Id*. at pp. 425-427.)

The court addressed a similar argument in *People v. Alvarado* (2001) 87 Cal. App. 4th 178 (*Alvarado*.) The defendant was convicted of rape of an elderly woman during the commission of a burglary and sentenced pursuant to statute to the mandatory term of 15 years to life. He argued that his troubled background, lack of a criminal record, and sincere remorse militated for a more lenient punishment. (*Id*. at p. 199.) The court concluded that despite his age and the fact he acknowledged his actions upon being caught, his callous assault of a vulnerable victim warranted harsh punishment. (*Id*. at pp. 199-200; see also *People v. Estrada* (1997) 57 Cal. App. 4th 1270 [holding a sentence of 25 years to life for forcible rape in the course of a burglary was not cruel and unusual punishment where the defendant, who had no prior felony convictions, used no weapon, made no threats and expressed remorse].)

Zelaya relies on *In re Rodriguez* (1975) 14 Cal. 3d 639 (*Rodriguez*) to argue his punishment is disproportionate to the crime. The defendant in *Rodriguez* was convicted of violating section 288 (committing a lewd or lascivious act on a child under age of 14) and sentenced to an indeterminate term of one year to life. (*Id*. at p. 642.) The defendant filed a writ of habeas corpus after serving 22 years, arguing the indeterminate penalty of one year to life in prison constituted cruel and unusual punishment in violation of the federal and state Constitutions. (*Id*. at pp. 642-43.) Our Supreme Court held the indeterminate sentence under section 288 on its face was not unconstitutional. (*Id*. at p. 648.) But the law, as applied to the defendant, "has resulted in the imposition of cruel and unusual punishment." (*Id*. at p. 651.)

The high court concluded that the defendant's fondling of a six-year-old child, although not "trivial," was not committed in a violent manner or with a weapon, lasted only a few minutes, and caused the victim no harm. (*Rodriguez, supra*, 14 Cal. 3d at pp. 654-55.) The defendant was 26 years old when he committed the offense, had a low IQ of about 68 and was functionally illiterate and unskilled. (*Id*. at p. 644, fn. 6.) The court believed "[h]is conduct was explained in part by his limited intelligence, his frustrations brought on by intellectual and sexual inadequacy, and his inability to cope with these problems." (*Id*. at p. 655.) The defendant had no criminal history "apart from problems associated with his sexual maladjustment." (*Ibid*.) The court held the 22 years he had already served was disproportionate to the offense considering shorter maximum terms imposed for more serious crimes. (*Ibid*.) The court concluded because the defendant had already served a term which was disproportionate to the offense, his continued imprisonment would constitute cruel and unusual punishment. (*Ibid*.)

*Rodriguez* is distinguishable. Nothing in the record suggests Zelaya possesses a low IQ, is illiterate or unskilled, or coping with problems of sexual inadequacy. Perhaps as important as any distinguishing facts are that, unlike *Rodriguez*, where the assault was a single act

16

lasting three minutes, here the sexual misconduct occurred over a period of three years, and the victim demonstrably and understandably suffered greatly from her ordeal. *Rodriguez* does not hold the indeterminate life sentence under section 288 is unconstitutional, but that the 22 years the defendant had served was disproportionate to his offense. Here, the minimum term of 15 years imposed upon [Petitioner] for count one is not unconstitutional under *Rodriguez*.

[Petitioner] compares his sentence to someone convicted of murder and claims his sentence is unconstitutionally disproportionate. [Petitioner], however, fails to recognize that he was convicted of not one but five felonies. "[T]he commission of a single act of murder, while heinous and severely punished, cannot be compared with the commission of multiple felonies. [Citation.]" (*People v. Cooper* (1996) 43 Cal. App. 4th 815, 826.) [Petitioner] repeatedly molested Jane Doe, a vulnerable child, over a period of three years. According to Jane Doe, [Petitioner] touched her every "pretty much every time" she saw him.

But, contrary to the authorities cited by [Petitioner], there are a host of cases with similar sentences for sexual assault that have been upheld on appeal. (*See Alvarado*, *supra*, 87 Cal. App. 4th 178 [upholding a life term for rape committed during a burglary against a challenge the sentence was cruel and unusual punishment]; *People v. Meneses* (2011) 193 Cal. App. 4th 1087, 1093-94 [upholding sentence of 15 years to life for a defendant convicted of a single lewd act with a 12 year old who became pregnant]; *People v. Cartwright* (1995) 39 Cal. App. 4th 1123 [upholding indeterminate term of 375 plus a determinate term of 53 years for sexual assault charges]; *People v. Retanan* (2007) 154 Cal. App. 4th 1219 [upholding sentence of 135 years to life against a cruel and unusual punishment challenge for defendant's sexual assaults of three young girls].)

"[G]reat deference is ordinarily paid to legislation designed to protect children, who all too frequently are helpless victims of sexual offenses." (*In re Wells* (1975) 46 Cal. App. 3d 592, 599.) [Petitioner]'s punishment "merely reflects the Legislature's zero tolerance toward the commission of sexual offenses against particularly vulnerable victims. It does not, however, render a defendant's sentence excessive as a matter of law in every case." (*Alvarado*, *supra*, 87 Cal. App. 4th at pp. 200-01.)

[Petitioner] has failed to demonstrate that his sentence is so disproportionate to his crimes that it shocks the conscience or offends fundamental notions of human dignity. (*See People v. Dillon* (1983) 34 Cal. 3d 441, 477-78.)

*Zelaya*, 2016 WL 491659, at *5-6 (brackets added).

The state appellate court's rejection of this claim was not unreasonable because

Petitioner's case is not one of those "extraordinary" cases that merits relief based on the alleged

disproportionality of his sentence. *See Gonzalez*, 551 F.3d at 882; *Norris*, 662 F.3d at

1286.  Petitioner was convicted of one felony count of sexual acts with a child 10 years old or younger and four felony counts involving multiple lewd acts upon a child under age 14.  He was sentenced to a cumulative sentence of 21 years to life.  Generally, as long as the sentence does not exceed the statutory maximum, it will not be overturned on Eighth Amendment grounds.  *See Belgarde v. Montana*, 123 F.3d 1210, 1215 (9th Cir. 1997); *see also United States v. Harris*, 154 F.3d 1082, 1084 (9th Cir. 1998) ("'[a] sentence which is within the limits set by a valid statute may not be overturned on appeal as cruel and unusual.'") (citation omitted).  Here, the separate terms do not appear to exceed the statutory maximum, and no allegation has been made stating that they do.

Furthermore, as Respondent asserts, the gravity of Petitioner's crimes was "grave, involving repeated sex offenses against a vulnerable child victim."  Dkt. 15-1 at 18.  As the state appellate court noted, "despite his age and the fact he acknowledged his actions upon being caught, his callous assault of a vulnerable victim warranted harsh punishment."  *Zelaya*, 2016 WL 491659, at *6.  The state appellate court considered the offenses, which occurred over a period of three years, and the harm inflicted on the victim and reasonably concluded that his sentence was not unconstitutionally disproportionate in light of his current offense, cases with similar sentences for sexual assault that have been upheld on appeal, and "the Legislature's zero tolerance toward the commission of sexual offenses against particularly vulnerable victims."  *Id.* at *6-7.  The state appellate court determined the record supported the finding that Petitioner "failed to demonstrate that his sentence is so disproportionate to his crimes that it shocks the conscience or offends fundamental notions of human dignity."  *Id.* at *5.

Accordingly, this Court is not persuaded that Petitioner's case is one of the "exceedingly rare" and "extreme" cases where gross disproportionality is applicable and merits habeas relief.  *See, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 1005 (1991) (mandatory sentence of life without possibility of parole for first offense of possession of 672 grams of cocaine did not raise inference of gross disproportionality); *Norris*, 622 F.3d at 1292-96 (concluding that sentence of life without possibility of parole for conviction of first degree child molestation of 5-year-old girl, where touching was brief and over clothing, was not grossly disproportionate).  Based on the foregoing,

18

the state appellate court's rejection of this claim was not contrary to, or an unreasonable

application of, clearly established Supreme Court precedent, nor was it based on an unreasonable

determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). Therefore,

Petitioner is DENIED habeas relief on his Eighth Amendment claim.

### C. *Miranda* Claim

#### 1. Background

Petitioner argues that the statements he made during the initial police interview on October

1, 2013 at his home should have been suppressed because the interview constituted custodial

interrogation, and he was not given advisements prior to the interview pursuant to *Miranda v.*

*Arizona*, 384 U.S. 436, 444 (1966). Petitioner "denies that he agreed to an interview" and

maintains that he "was never told that he ha[d] the right to consult a lawyer." Dkt. 1 at 27.

Additionally, he argues that the questioning constituted custodial interrogation because "he felt his

freedom was at stake . . . [and] felt compelled [and] pressured by the situation and by the police

presence." *Id*.

The following is a summary of the facts surrounding Petitioner's initial police interview by

Sergeant Santiago Castillo of the Antioch Police Department, taken from the transcript of the

audiotape-recording of the initial police interview at his home, as well as from the factual

backgrounds given by Petitioner and Respondent regarding the initial interview. *See* Resp't Ex. 4

(Dkt. 15-4, "Defendant Interview Number 1"); Dkts. 1, 15-1.

When Petitioner arrived at home after his work-day on October 1, 2013, he was met by

two officers, Sergeant Castillo and Officer Christopher Dee, who had arrived before Petitioner and

had been let in by E., his co-resident (and former girlfriend). Dkt 15-4 at 1. Before beginning

questioning, Sergeant Castillo asked E., "could we get some privacy?" *Id.* Once alone, Sergeant

Castillo began the interview as follows:

> Q: All right, Daniel. I'm here—um, first of all you're not under arrest or nothing, okay. I don't want you to think you're under arrest or anything like that.
>
> A: All right.
>
> Q: But I want to talk to you about something that was reported to us, um, it has to do with,

uh, your niece, okay.

*Id.* at 74. Once Sergeant Castillo established that Petitioner knew Jane Doe as his "niece" or rather E.'s niece, the questioning continued:

> Q: Okay, okay. All right. So, [Jane Doe] reported to us today, um, that for the last three years you—you'd been touching her.
>
> A: Yeah, that's right.
>
> Q: Yeah, so, I mean, you know, I don't know how—how truthful it is or not, but I wanted to get your side of the story, okay, because there's always two sides.
>
> A: Mm-hm.
>
> Q: Okay. She said it started when you guys lived in Bay Point, uh, when you were touching her breasts and her—her private vagina area.
>
> A: Mm-hm.
>
> Q: Um. And that you've done it over 50 times over the last three years. Is it—is any of that true?
>
> A: Yeah, that's true.

*Id.* at 74-75.

Petitioner continued to answer all of Sergeant Castillo's questions and admitted to touching Jane Doe on her breasts and vagina, and to kissing her breasts. *Id.* However, he maintained that he did not put his finger inside of her vagina. *Id.* at 74, 83, 92.

The Court notes that defense counsel, Deputy Public Defender Ilean Baltodano, did not file a motion to suppress any of the aforementioned statements made by Petitioner during the initial police interview on October 1, 2013 at his home. By contrast, the record does show that Attorney Baltodano filed a motion *in limine* prior to trial, in which she argued that (among her other requests for evidentiary orders) Petitioner's statements made *at the police station* were inadmissible because he asserted his right to an attorney after he was read his *Miranda* rights. 1CT 88; 1 RT 21-22, 31-36. The trial court denied the motion *in limine* on this issue upon finding that Petitioner's statements at the police station were admissible because there were "not response[s] to interrogation." 1 RT 36. While the trial court's findings relating to Petitioner's

statements at the police station are not relevant to Petitioner's instant *Miranda* claim, this Court

notes that at trial Attorney Baltodano conceded the validity of this initial statement, arguing as

follows:

> MS. BALTODANO: . . . [Petitioner] made a statement in his house
> that was recorded when he was not under arrest and then he was
> placed under arrest and they he went back to the station and the
> officers – that's where he asserted his right to an attorney at that point.
>
> THE COURT: Okay. So then the only statement that would come in
> is the first statement.

1 RT 21. Attorney Baltodano did not object to the trial court's assessment that the "first

statement" was admissible. 1 RT 21. At another point during her argument, Attorney Baltodano

indicates that "there's a statement already that the People have, the statement that he made at the

house," but she stressed that it was "not part of the analysis." 1 RT 34.

As mentioned above, Petitioner did not argue the instant *Miranda* claim on direct appeal.

*See Zelaya*, 2016 WL 491659, at *1-7. Instead, Petitioner raised his *Miranda* claim for the first

time in his state habeas petition in the California Supreme Court. *See In re Zelaya (Danny) on*

*H.C.*, Case No. S237535 (Nov. 30, 2016); Resp't Ex. 16 (Dkt. 15-7 at 151). The California

Supreme Court summarily denied his state habeas petition. *See In re Zelaya (Danny) on Habeas*

*Corpus*, Case No. S237535 (Nov. 30, 2016); Resp't Ex. 16.

In the present federal petition, Petitioner states his *Miranda* claim as follows:

> On October 1, 2013, two officers responded to Petitioner's residence
> in Antioch. The officers made contact with [E.] who stated she knew
> about the accusations, but Petitioner did not. Petitioner arrived home
> a short time later and **allegedly** agreed to an interview[FN7] as the
> officer wanted to allow him an opportunity to tell his side of the story
> in regards to Jane Doe 1's accusations. (*See* Preliminary Hearing
> Transcript p. 12; and Probation Officer's Report p. 5.)
>
> [FN7:] Petitioner denies that he agreed to an interview. Petitioner was
> never told that he has the right to consult a lawyer and to have a lawyer
> present during questioning, and that law enforcement agents must
> explain this right to the suspect **before questioning begins**. The
> language used by the officers was intimidating and suggestive to have
> Petitioner speak with them. Yet, the officers were fully apprised
> about interview 1. Two officers surrounded him, he knew they had
> guns, he felt his freedom was at stake. At that point, Petitioner felt
> compelled—pressured by the situation, and by the police presence, to
> speak with them. After Petitioner made a full confession, the police
> read him his *Miranda* rights.

The record **does not** reflect that the officers explained to Petitioner that a suspect in his position undergoing custodial interrogation has the right to consult a lawyer and to have a lawyer present during questioning, and that law enforcement agents must explain this right to the suspect **before questioning begins**. (*See* Preliminary Hearing Transcript p. 4-17, and *see* 12; and Probation Officer's Report p. 5.)

During the line of questioning thereafter, the officers told Petitioner that Jane Doe 1 reported that he had been touching her over the last three years. The foundation of this allegation came from Doe 1's "interview number 1" which was paramount evidence in this case. Petitioner immediately said, "Yeah, that's right." (Probation Officer's Report p. 5) Thereafter, the officers asked questions that a reasonable officer, or person of intelligence, should have known were very incriminating. (*Id.* at 6-7.) Simply put, the officers were obtaining a confession that was going to be used in the court of law.

After making numerous incriminating statements, the officers finally arrested Petitioner, transported him to the Antioch Police Department, where he was finally read his "*Miranda* Rights." ALL his pre-*Miranda* statements were used at trial to convict him.

Dkt. 1 at 27-28 (footnote and emphasis in original and brackets added).

### 2.    Applicable Law

In *Miranda*, the Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted in evidence. *Miranda* and its progeny govern the admissibility of statements made during custodial interrogation in both state and federal courts. *See* 384 U.S. at 443-45. The requirements of *Miranda* are "clearly established" federal law for purposes of federal habeas corpus review under 28 U.S.C. § 2254(d). *Juan H.*, 408 F.3d at 1271; *Jackson v. Giurbino*, 364 F.3d 1002, 1009 (9th Cir. 2004).

A person subjected to custodial interrogation must be advised that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *Miranda*, 384 U.S. at 444. The warnings must precede any custodial interrogation, which occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action. *Id*.

As interpreted, federal courts have found that to be entitled to *Miranda* warnings, two factors must be established: custody and interrogation. *Id.*; *see also Illinois v. Perkins*, 496 U.S. 292, 297 ("It is the premise of *Miranda* that the danger of coercion results from the interaction of

United States District Court
Northern District of California

custody and official interrogation"). The Court focuses here on the first.

*Miranda* protections are triggered "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). "[I]n custody" means "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. at 495). It requires that "a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave," as judged by the totality of the circumstances. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

This determination is based on an objective inquiry to determine the circumstances surrounding the interrogation, and whether a reasonable person would have felt at liberty to end the interrogation and leave, given those circumstances. *Id.* at 112. In essence, a court must determine "whether a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave." *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981). Factors relevant to the inquiry include:

> (1) the language used by the officer to summon the individual, (2) the extent to which the defendant is confronted with evidence of guilt, (3) the physical surroundings of the interrogation, (4) the duration of the detention and (5) the degree of pressure applied to detain the individual.

*United States v. Redlightning*, 624 F.3d 1090, 1102-03 (9th Cir. 2010).

With respect to the third factor (physical surroundings of the interrogation), the Ninth Circuit has acknowledged that an interrogation conducted within the home presents some analytical challenges, stating as follows:

> The usual inquiry into whether the suspect reasonably believed he could "leave" the interrogation does not quite capture the uniqueness of an interrogation conducted within the suspect's home. "Home," said Robert Frost, "is the place where, when you go there, they have to take you in." Robert Frost, The Death of the Hired Man, *in* THE POETRY OF ROBERT FROST 38 (Edward C. Latham ed., 1967). If a reasonable person is interrogated inside his own home and is told he is "free to leave," where will he go? The library? The police station? He is already in the most constitutionally protected place on earth. To be "free" to leave is a hollow right if the one place the suspect cannot go is his own home. [Citation.] Similarly, a

> reasonable person interrogated inside his own home may have a different understanding of whether he is truly free "to terminate the interrogation" if his home is crawling with law enforcement agents conducting a warrant-approved search. He may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search.

*United States v. Craighead*, 539 F.3d 1073, 1082-83 (9th Cir. 2008). Thus, an interrogation in the suspect's home may be found to be custodial under certain circumstances. *See Orozco v. Texas*, 394 U.S. 324, 325 (1969) (holding that an interrogation was custodial where four police officers arrived at the suspect's home, entered the bedroom, and behaved as though the suspect was not free to leave while he was questioned). In *Craighead*, the Ninth Circuit considered how to apply the traditional *Miranda* inquiry to an in-home interrogation, and held that

> [a]n interrogation conducted within a suspect's home is custodial, and requires *Miranda* warnings, if the circumstances surrounding the interrogation turned the home into a "police dominated atmosphere."

*Craighead*, 539 F.3d at 1083. The following factors are relevant to this "fact intensive" determination of whether the circumstances surrounding a suspect's interrogation turned the home into a "police dominated atmosphere," including:

> (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.

*Id*. at 1084 (footnote omitted). Not all factors need be present to find custody. *See United States v. Brobst*, 558 F.3d 982, 996 (9th Cir. 2009). Moreover, these factors are not exhaustive, as other factors may be pertinent to, or even dispositive of, the custody question. *United States v. Bassignani*, 560 F.3d 989, 996 (9th Cir. 2009). The defendant bears the burden of proving that he was in custody or under arrest at the time of the interrogation. *Id.* at 993.

### 3. Analysis

Petitioner argues that he was in custody during his initial interview and therefore should have been advised of his *Miranda* rights. Dkt. 1 at 27. In support of his claim, Petitioner argues that the questioning constituted custodial interrogation because "[t]he language used by the officers was intimidating and suggestive," and because the officers "surrounded him, he knew they

had guns, [and] he felt his freedom was at stake." *Id.* at 27, fn. 7. Petitioner stated that he "felt

compelled—pressured by the situation, and by the police presence, to speak with them." *Id.*

As mentioned above, the state supreme court summarily denied habeas relief to Petitioner

on his *Miranda* claim. *See* Resp't Exs. 15, 16. Because the state supreme court gave no reasoned

explanation of its decision on Petitioner's *Miranda* claim, this Court conducts "an independent

review of the record" to determine whether the state supreme court's decision was an objectively

unreasonable application of clearly established federal law. *Plascencia*, 467 F.3d at 1197-98;

*Himes*, 336 F.3d at 853.

Respondent argues that the state supreme court's decision was "reasonable because, at the

time of the interview, petitioner had not been arrested nor his movements restricted to the degree

associated with custody." Dkt. 15-1 at 20. Respondent elaborates by stating as follows:

> Here, the officers contacted petitioner at his residence after he got off
> work. Resp. Exh. 4; Defendant Interview Number 1 at 1. Such a time
> and location weighs strongly in favor of a finding that the ensuing
> interview was not a custodial interrogation. Furthermore, Sergeant
> Santiago Castillo stated to petitioner before asking him any questions,
> *"first of all you're not under arrest or nothing, okay, I don't want you
> to think you're under arrest or anything like that."* Resp. Exh. 4;
> Defendant Interview Number 1 at 2. Courts "have consistently held
> that a defendant is not in custody when officers tell him that he is not
> under arrest and is free to leave at any time." *United States v.
> Bassignani*, 575 F.3d 879, 886 (9th Cir. 2009); *Beheler*, 463 U.S. at
> 1122-23.

*Id.* at 20-21 (emphasis supplied).

Applying the aforementioned legal principles to the instant matter, the Court concludes

that the state supreme court's rejection of Petitioner's *Miranda* claim was objectively reasonable,

as demonstrated below by an analysis under the *Redlightning* factors and the *Craighead* factors

(some of which weigh in favor of finding a "police dominated atmosphere" and others which do

not). *See Redlightning*, 624 F.3d at 1102-03; *Craighead*, 539 F.3d at 1083.[6]

---

[6] However, "[i]t is well settled . . . that a police officer's subjective view that the individual
under questioning is a suspect, if undisclosed, does not bear upon the question whether the
individual is in custody for purposes of *Miranda* . . . one cannot expect the person under
interrogation to probe the officer's innermost thoughts." *Stansbury*, 511 U.S. at 324. Such views
are relevant only if the officer's suspicions were revealed to the individual under interrogation and
would have affected how a reasonable person in that position would perceive his freedom to leave.
*Id.* at 324-25.

United States District Court
Northern District of California

The first *Redlightning* factor, the summoning language, is problematic and therefore the Court weighs it neutrally. On the one hand, nothing in the record shows that Sergeant Castillo was aggressive or accusatory, either physically or verbally. The tone of the encounter was amiable and the police appear to have made the Petitioner comfortable. That, however, could also have been to elicit an admission. Next, while Sergeant Castillo made it clear that Petitioner was ***not*** under arrest at the start of the interview, he never told Petitioner that he could terminate the interview at any time or leave. Nor did anything suggest that Petitioner could do so. This is further compounded by the fact that Petitioner was in his home, and as the *Craighead* court realized, there was no place for Petitioner to go.

The second factor, the extent to which the defendant is confronted with evidence of guilt, does not weigh in favor of the state supreme court's decision. The record shows that Sergeant Castillo immediately informed Petitioner that his "niece" had accused Petitioner of "touching" her on her breasts and vagina multiple times for the past three years. Thus, Petitioner was ***immediately*** confronted with guilt.

Because the initial interview at issue took place at Petitioner's home, the third and fifth factors—physical surroundings of the interrogation and the degree of pressure applied to detain the individual—will be analyzed below using the *Craighead* factors.

The fourth factor, the length of the detention, supports the state supreme court's decision. Petitioner was questioned for about 17 minutes based on the audiotape recording, which was not unreasonably long.[7] Moreover, the length of the questioning had no impact on the admissions, as they came immediately, that is right after Sergeant Castillo confronted him about Jane Doe's accusations in the initial minutes of the interview.

With respect to the fact that the interview occurred at Petitioner's home, the Court expands its discussion by considering the four *Craighead* factors in order to determine whether a "police dominated atmosphere" existed. *See Craighead*, 539 F.3d at 1083.

---

[7] Along with the transcript of Petitioner's initial interview, Respondent submitted the entire audiotape-recording of the interview on a compact disc ("CD"). Resp't Ex. 7, CD 4 of 5, "Def. Interview #1" (Dkt. 15-4). Based on this recording, the interview lasts for under 17 minutes. *See id.*

First, the record shows Petitioner was questioned by *two* officers. Presumably, the officers were armed. The record does not reflect either way whether their guns were unholstered, nor do we know whether the police were in plain clothes. *Cf. id.* at 1089 (finding interrogation custodial where ten armed officers from various agencies present, suspect escorted to back storage room and door closed, and officers blocked exit); *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) (finding that the presence of eight officers in the home, one of whom unholstered his gun, contributed to police dominated environment). However, nothing in the record suggests any reason for the guns to be unholstered nor that the officers were in riot gear. This factor alone would not suggest a "police dominated atmosphere." *See Craighead*, 539 F.3d at 1083.

Second, Petitioner does not suggest that he was restrained in any way, either by physical force or by threats. *See id.* at 1083; *see also United States v. Basher*, 629 F.3d 1161, 1165 (9th Cir. 2011) (finding no custody where there was no display of weapons by officers, no use of physical force, no threatening language, and no significant curtailment of defendant by officers who confronted defendant next to his tent, made small talk with him, and let him light a cigarette); *United States v. Axsom*, 289 F.3d 496, 502 (8th Cir. 2002) (finding no strong-arm tactics where officers "did not adopt a threatening posture toward [defendant], display their weapons, or make a physical show of force during the questioning"). Again, this factor also would not suggest a "police dominated atmosphere." *See Craighead*, 539 F.3d at 1083.

Third, on the issue of isolation from others, the record shows that E. was present at the home because she let the officers come inside the home to wait for Petitioner. Dkt. 15-4 at 73. The officers did ask "if they could talk to him alone" prior to starting the interview, *see* Resp't Ex. 7, CD 4 of 5, "Def. Interview #1" (Dkt. 15-4), and asked E. to stay in the back room with her small child while the officers conducted the interview with Petitioner, 1 RT 198. While the record suggests the officers explicitly attempted to isolate Petitioner from others so that they could conduct a "private" interview, it does not suggest that he was placed or locked away in a room to which others did not have access or that access to leave the room was blocked. *Cf. Craighead*, 539 F.3d at 1087 ("[a] frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support

during the questioning and deter a suspect from making inculpatory statements."). Again, the existence of police presence alone does not create a "police dominated atmosphere." *See id.* at 1083.

Finally, the Court considers whether Petitioner was informed that he was free to leave or terminate the interview, and the context in which any such statements were made. *See id.* at 1084. Petitioner was ***never told*** that he was free to leave or terminate the interview. *See* Resp't Ex. 7, CD 4 of 5, "Def. Interview #1" (Dkt. 15-4). Instead, Sergeant Castillo told Petitioner he was *not* under arrest. *Id.* The Ninth Circuit has "consistently" held that a defendant is "not in custody" when officers tell him that he is not under arrest and is free to leave at any time. *Bassignani*, 575 F.3d at 886. Here, only half of those statements were given.

In *Craighead*, although the defendant was told he was free to go, the circumstances of the interview and number of different agencies involved in the search of his home left the defendant justifiably concerned that the one officer who told him that he was not under arrest and that his statements were voluntary did not speak for the other officers. *See* 539 F.3d at 1088-89. No such cause for concern existed here. While Petitioner was told he was not under arrest, he was not specifically told that he could terminate the interview or that he could require the police to leave. *See* Dkt. 15-4. That said, based on the Court's review of the audiotape-recording of the initial interview, Petitioner seemed calm and alert during the questioning, and the officer's language and word choices were cordial and respectful. *See id.* Sergeant Castillo did not use an accusatory tone when inquiring about the incidents involving Jane Doe, which he brought up at the beginning of the interview. *See id.* Moreover, the officers made it clear to Petitioner right away that they were there to speak with him about a "report" made to them concerning his "niece." Dkt. 15-4 at 74. As the Court has noted above, Petitioner admitted to the allegations almost immediately, and, again, upon listening to the interview the Court further notes that his responses were made without any hesitation or pressure at the outset. Resp't Ex. 7, CD 4 of 5, "Def. Interview #1" (Dkt. 15-4). Once the interview continued, given his initial admission, Petitioner did continue to make many more admissions in response to the officers' direct questioning. Petitioner admitted to touching Jane Doe on her breasts and vagina "sometimes." Dkt. 15-4 at 75. As shown by the following

transcript of one portion of the interview, Petitioner responded to Sergeant Castillo's inquiries, and Petitioner displayed a willingness to elaborate on the reasons for his behavior and even denied that Jane Doe was lying, stating as follows:

> A: . . . [S]he's not lying, she's just a little kid and I understand that.
>
> Q:  Right.  How – how come you're doing that to – to her?
>
> A:  I don't know because, you know, I start feeling something in my body.
>
> Q:  Mm-hm.
>
> A: . . . so I'm not gonna say I'm a raper, you know, because I am not.
>
> Q:  Right.
>
> A:  I have a daughter.  So, I start feeling something weird in my body  . . .
>
> Q. Mm-hm.
>
> A: . . . I don't know if you guys can understand [what was] happening?
>
> Q.  No, yeah, absolutely.
>
> A:  When I see a – a girl it's like, um, you feel like, you know, like, my heart was pumping like blood, you know, something . . .
>
> Q:  Really.
>
> A: . . . and emotional, so.
>
> Q:  Got you – got you excited?
>
> A: Uh, I – I never you know feel this before . . .
>
> Q:  Mm-hm.
>
> A: . . . so it's kind of weird.  I mean, it's kind of weird.

Dkt. 15-4 at 80.  Moreover, during the interview, Petitioner even shared about his background and talked about his work as well as parts of his upbringing in Honduras.  *Id*. at 87.  Petitioner explained his feelings about his actions in detail and the trauma he experienced, even mentioning that he "wasn't sure" if "there's a God in heaven."  *Id*.  As mentioned, the interview lasted only 17 minutes.  *Id.* at 73-96.

On balance, given all the *Craighead* factors above (which take into consideration the two remaining *Redlightning* factors, i.e., physical surroundings of the interrogation and the degree of

pressure applied to detain the individual), the Court finds that a "police dominated atmosphere" did not exist. *See Craighead*, 539 F.3d at 1083; *cf. United States v. Czichray*, 378 F.3d 822, 825, 830 (8th Cir. 2004) (interview in defendant's home lasting nearly seven hours was not custodial). Thus, the third and fifth *Redlightning* factors weigh in favor of the state supreme court's decision.

In summary, three *Redlightning* factors (physical surroundings of the interrogation, length of the detention, and the degree of pressure applied to detain the individual) weigh in favor of the state supreme court's decision, the second *Redlightning* factor (the extent to which the defendant is confronted with evidence of guilt) weighs against, and the first *Redlightning* factor (the summoning language) weighs neutrally.

Accordingly, upon examination of the objective circumstances surrounding Petitioner's initial police interview at issue, the totality of the circumstances indicates that Petitioner has failed to meet his burden of showing that he was in custody at the time of that interview. *See Bassignani*, 560 F.3d at 993. It then follows that if Petitioner was not detained or in custody, no *Miranda* warning would have been required. *See Stansbury*, 511 U.S. at 322. Therefore, the state supreme court's summary denial of his *Miranda* claim was objectively reasonable. *See Plascencia*, 467 F.3d at 1197-98; *Himes*, 336 F.3d at 853. Accordingly, Petitioner is not entitled to habeas relief on his *Miranda* claim, and it is DENIED.

## V.     CERTIFICATE OF APPEALABILITY

No certificate of appealability is warranted in this case. For the reasons set out above, jurists of reason would not find this Court's denial of Petitioner's claims debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

## VI.    CONCLUSION

For the reasons outlined above, the Court orders as follows:

1.      All claims from the petition are DENIED, and a certificate of appealability will not issue. Petitioner may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

2.     The Clerk of the Court shall terminate any pending motions and close the file.

IT IS SO ORDERED.

Dated: September 19 , 2019

YVONNE GONZALEZ ROGERS
United States District Judge